PEATS *v.* STATE OF INDIANA.

[No. 26,852.  Filed January 18, 1938.  Rehearing denied
April 5, 1938.]

562

*Fae W. Patrick, Thomas L. Webber, Frank A. Symmes,* and *Owen S. Boling,* for appellant.

*Omer S. Jackson,* Attorney-General, *A. J. Stevenson,* Assistant Attorney-General, and *Patrick J. Smith,* Deputy Attorney-General, for the State.

FANSLER, J.—Appellant was charged with murder in an indictment returned by a grand jury of Marion County, and was tried and convicted of voluntary manslaughter.

The indictment charged appellant and three others with inflicting a violent injury upon John Marshall Penny in Hendricks County, Indiana, by throwing and striking at and against the body of Penny with a heavy missile, the exact kind and nature of which was unknown to the grand jurors, with the intent to unlaw-

fully, feloniously, purposely, and with premeditated malice, kill and murder him; that they did thereby inflict a mortal wound upon him, of which he thereafter, within a few days, died in Marion County, Indiana.

Error is predicated upon the overruling of a motion to quash the indictment, the sustaining of a demurrer to appellant's answer in abatement, in permitting the amendment of the indictment by changing the date upon which the death of Penny occurred from the 9th day of March to the 10th day of March, upon the overruling of appellant's motion in arrest of judgment, and upon the overruling of appellant's motion for a new trial.

In support of his motion to quash, his answer in abatement, and motion in arrest of judgment, appellant contended, and contends here, that the offense is charged in the indictment to have been committed in Hendricks County, and that therefore the Criminal Court of Marion County had no jurisdiction to try the case, and the grand jury of Marion County had no jurisdiction to return the indictment. One of the specifications of appellant's motion for a new trial is that the evidence is not sufficient to sustain the indictment, and, in support of this contention, it is asserted that the evidence shows the offense to have been committed in Hendricks County and not in Marion County, and that therefore the venue of the action was in Hendricks County, and that, since the venue was not proven to have been in the county where the indictment was returned, the evidence is insufficient. In support of the contention, appellant cites section 13 of article 1 of the Constitution of Indiana, which provides that the accused shall have the right to a public trial in the county in which the offense was committed, and the statutes which provide that the cause shall be tried in the county in which the offense was committed.

Section 9-211 Burns' Ann. St. 1933, section 2020 Bald-

win's Ind. St. 1934, provides: "If any mortal wound be given or poison administered in one county, and ■■ death, by means thereof, ensue in another, the jurisdiction is in either county." Section 9-207 Burns Ann. St. 1933, section 2016 Baldwin's Ind. St. 1934, provides: "When a public offense has been committed partly in one county and partly in another, or the act or effects constituting or requisite to the consummation of the offense occur in two or more counties, the jurisdiction is in any one of such counties." In *Brockway* v. *State* (1923), 192 Ind. 656, 657, 658, 138 N. E. 88, a case in which a blow was struck in one county, resulting in death in another, it is said: "The crime that we are here talking about is a composite one. The stroke does not make the crime. The death does not make the crime. It is the composition of the two." The crime here charged was not completed by the blow, but the blow and its effects continued to operate, like a succession of blows, until it resulted in death. In other words, the blow and its effects continued to operate; beginning in Hendricks County and extending into Marion County, where it finally accomplished the complete crime by causing death. Since the thing that constituted the crime denounced was accomplished partly in each of the counties, the legislative enactment fixing the jurisdiction in either county does not offend against the constitutional provision. The venue was therefore properly laid in Marion County, and the grand jury and the court had jurisdiction. See *Archer* v. *State* (1886), 106 Ind. 426, 7 N. E. 225; *Hauk* v. *State* (1897), 148 Ind. 238, 46 N. E. 127.

It is also contended that the indictment is bad for uncertainty. The indictment charges the defendants with throwing missiles against the body of ■■ Penny, with intent to kill and murder him, which is followed by the words: "And did then and

there and thereby . . . inflict a mortal wound." It is contended that, because the word "and" is used, the throwing of the missiles and their striking against Penny's body are not sufficiently alleged to have been the means by which the mortal wound was inflicted. But it will be noted that the language, "and did then and there and thereby," is amply sufficient to indicate that it was by the throwing and striking that the mortal wound was inflicted. The contention seems highly technical. No greater certainty is required in criminal pleadings than in civil, and it is inconceivable that the indictment can be misunderstood in respect to the offense alleged and the means by which the death is charged to have been accomplished.

It is also contended that the indictment for murder in the first degree would authorize a verdict of involuntary manslaughter; that appellant was only an accessory, an aider, or abettor, and that such cannot be guilty of involuntary manslaughter. But whether appellant was an aider, or abettor, or a principal, does not appear from the face of the indictment. The indictment charged him with the offense, and accessories, and aiders, and abettors may be charged and tried in the same manner as principals.

The indictment describes the injury as having been inflicted "with a heavy missile, the exact kind and nature of which is to the grand jurors unknown." It is asserted that the grand jurors had knowledge and could have described the missile. Statements in an indictment as to lack of knowledge on the part of the grand jury must be taken as true unless the contrary appears on the face of the indictment. *Miller* v. *State* (1937), 211 Ind. 317, 6 N. E. (2d) 948. It was also contended that the word "heavy" is a relative term, and has no value as descriptive of the

weapon used, but it conveys a definite impression, as do the words "blunt" and "sharp."

During the trial, the prosecuting attorney filed a written motion to amend the indictment by substituting the words "10th day of March" in all places where the words "9th day of March" were used, as indicating the date of the death of the injured person. This motion was sustained. A new indictment was not filed, but the court made an order that the date, March 9th, be stricken out and changed to the correct date (as shown by the evidence), March 10th. Chapter 189 of the Acts of 1935 (Acts 1935, p. 928) provides: "That the court may at any time before, during or after the trial amend the indictment or affidavit in respect to any defect, imperfection or omission in form, provided no change is made in the name or identity of the defendant or defendants or of the crime sought to be charged." Time is not of the essence of the offense, and the amendment did not alter the indictment in any material respect. See *Crickmore* v. *State* (1938), post 586, 12 N. E. (2d) 266. The contention is made that the affidavit as amended was not approved by the prosecuting attorney. The statutory provision that affidavits, which are the basis of criminal prosecutions, must be approved by the prosecuting attorney, does not apply to indictments. No constitutional provision is pointed to as violated by the legislative enactment permitting amendments, nor is it suggested that appellant was prejudiced in any manner by the amendment.

Haywood, who was indicted with appellant, testified as a witness for the state. He said that appellant was his superior officer in the Teamsters' and Chauffeurs' Union; that some truck drivers had been paying dues, and some had not; that appellant said to the witness that the heat was being put on him and he had to do something about it; that he did not care what was done

just so it was done. The witness was on the payroll of the union. He said that Peats told him that he heard he was supposed to be going out nights, and was not going out, and that he was going with him to see what damage was being done; that an arrangement was made by which appellant was to meet the witness that evening; that: "We were to get the truck and he was to follow behind and whatever we got he was to see how much damage was done. I mean by 'get the truck' to stone the trucks"; that the witness got Crickmore and two women in the car. They got 20 or 25 rocks and some pieces of concrete; that he waited at the appointed place, and a car such as Peats drove came down the road behind him, flashed its lights, and slowed down. The witness pulled out, and the car behind followed him. The cars went west until they saw a Kroger truck driving east. They turned around and followed the truck, passed it, and returned to meet it. The occupants of the witness' car each got a rock or brick, and they drove toward the truck at the rate of 70 miles an hour. As they approached the truck they threw rocks at it. They heard the rocks hit. They returned to Indianapolis. The witness saw appellant the next morning. Williams, another defendant, came to him in the morning and told him that things were getting hot, and gave him some money, and told him to leave town. He went to Louisville. Peats and Williams came to Louisville after him in four or five days. Peats said everything was all right, to come back; that there had been no police or detectives around the office. Peats paid him the amount of his hotel bill in Louisville. Peats told him that if any one was picked up to keep their mouths shut; and that "they would furnish a lawyer to get us out of jail immediately"; that Peats paid for the Buick sedan in which they were driving when the atack on the truck was made. He said that Peats and Williams told him

the reason they wanted to meet him on the night in question was that there had been some complaints about him going out on the road and not doing anything. The witness said that during all of the time he was connected with the union they attempted to get Kroger drivers unionized; that some of them belonged to the union, and some did not; that: "We did this by talking to the drivers and by often throwing rocks at Kroger trucks on the highways. Most of this was done by myself, Victor Crickmore, Joe Williams, Harry Peats and a few other members who could be trusted by the officers"; that "Peats suggested that if we would bump off a Kroger driver, Kroger would fall into the union, and that we could get a lot more new members into the union." He said that he had orders from Peats to talk to the men and try to get them to join the union, and, if they would not join, then to use force, and that he also had orders to go out and break the window-lights out of Kroger stores. There was evidence that, on the night referred to by the witness, when they threw the stones and bricks at a Kroger truck, the truck ran off the road, and, when passers-by approached, Penny, who was charged to have been murdered, was in the truck seat, bleeding from a head injury, semi-conscious, and that he afterwards died from the injury. There was testimony of other witnesses that Peats said to an employer of truck drivers that, unless their drivers joined the union, stones and brickbats would be thrown through their windshields, and that he, Peats, would be at home, in bed, when it was done. Appellant testified as a witness that he was at home, in bed. A truck driver testified that he had been violently assaulted by the witness Haygood, Peats, Peats' father, and others, at a gasoline station where he stopped his truck. There was evidence of other circumstances which had a tendency to corroborate the testimony of the witness Haygood,

Appellant contends that Haygood was conclusively impeached, and that his evidence was the only evidence connecting appellant with the offense, and that, since Haygood's testimony was not corroborated, there must necessarily be a failure of proof. Haygood was disputed, but, as pointed out, there was much evidence tending to corroborate him. Whether his testimony was to be believed, was for the jury to determine. By its verdict it has indicated that, upon all of the evidence, it believed appellant was guilty, and this court cannot disturb that conclusion.

It is contended that there is no evidence that any of the accused indicted with appellant threw the rock which struck the deceased. But that was not necessary, if it was thrown in furtherance of a plan, aided and abetted by appellant. It is immaterial whether any of the conspirators, or persons acting for them, other than appellant, was indicted.

There are also contentions, which cannot be taken seriously, that a rock or brick does not come within the definition of a heavy missile, and that there is no evidence that the instrument used by the killer was a deadly weapon.

Appellant says that there is no proof of the offense of voluntary manslaughter, since there is no proof of an intentional injury. There is ample evidence of a deliberate plan, pursuant to which appellant and his companion threw heavy missiles from an automobile, speeding at 70 miles an hour, into the windshield of the truck which Penny was driving. Since a person may properly be presumed to intend the natural and ordinary consequences of his act, it is difficult to understand why such a contention is made.

Victor Crickmore was indicted with appellant, but was to be tried separately. Appellant called him as a

witness. He was sworn, and, after answering as to his name and a few preliminary questions, refused to testify further upon the ground that his testimony might tend to incriminate him. Thereupon the prosecution asked if he was the same Victor Crickmore who had made a written statement, as follows, and then the prosecuting attorney began to read the statement. The defense objected. The court ruled that the question was proper, as it went to the identity of the witness, but that he could refuse to answer if he saw fit. The prosecuting attorney was permitted to continue reading the statement, which was a confession, reciting facts substantially the same as those testified to by the defendant Haygood. At the conclusion of the question, an objection was sustained, and the witness was not required to answer. The defense then requested that the jury be instructed to disregard the question, and the court fully instructed the jury as requested. The defense seemed content with the ruling and instruction, and made no motion to withdraw the submission. The prosecuting attorney should not have been permitted to read the confession under the pretext of asking a question with reference to the identity of the witness. Since he had refused to testify upon constitutional grounds, his identity was of no importance. The state seems to have been seeking to get before the jury the witness' confession, which could not be gotten in evidence in any proper manner. This was an impropriety, which can only be explained upon the supposition that it was done spontaneously and during the excitement of the trial, for the purpose of overcoming some fancied advantage to the defense in putting the witness upon the stand. But it must be presumed that the jury heeded the admonition of the court, and gave no consideration whatever to the question. Appellant must have been satisfied with the court's admonition, otherwise he had the right

to ask that the submission of the cause be withdrawn. This was not done. It is well settled that, where the jury has been instructed to disregard the matter, a failure to ask for the withdrawal of submission waives the right to predicate error upon misconduct of counsel, or the erroneous admission of evidence. *Madden* v. *State* (1897), 148 Ind. 183, 47 N. E. 220.

Error is predicated upon the admission of evidence concerning attacks upon trucks and truck drivers, by throwing rocks, and of plans to attack other trucks and truck drivers, both before and after the attack which was the basis of the indictment. There was evidence of a plan or scheme, participated in by appellant, to attack trucks and truck drivers who were not members of the union, and that appellant was one of the directing forces in the plan and in the attacks. As the court correctly instructed the jury, any evidence which tended to corroborate the testimony of the witness Haygood, that appellant had directed the attack which caused the death of Penny, was competent, and, since there was evidence that this particular attack was only one of many contemplated by appellant's plans, it was competent to show that he threatened, instigated, or participated in, similar activities, for the purpose of showing motive, intent, or guilty knowledge. It is clear that the testimony of Haygood, that he was directed by appellant to attack Kroger trucks, is corroborated and strengthened by showing that appellant threatened such attacks and participated in similar attacks. In murder cases, previous assaults or attacks upon the person killed are always admissible to show intention or malice. Here there is evidence that appellant and others entered into a common purpose and design to attack not one person, but a class of persons, truck drivers who had not joined their union. The malice and intention to injure was not

directed against a particular individual, but against a class, and evidence that appellant aided or participated in, or counselled or encouraged, similar attacks against members of the class, is clearly competent to show malice toward Penny, who was one of the class, a design and purpose that the thing should be done which resulted in his death. It is well settled that collateral crimes may be proven where they tend to prove motive, malice, guilty knowledge, or intention. *Sanderson* v. *State* (1907), 169 Ind. 301, 82 N. E. 525; *Card* v. *State* (1886), 109 Ind. 415, 9 N. E. 591.

Appellant tendered an instruction to the effect that if Haygood and Crickmore, or either of them, killed Penny, involuntarily and in the commission of an unlawful act, appellant could not be convicted. The instruction was refused. Appellant contends that this is error, and relies upon the case of *Adams* v. *State* (1879), 65 Ind. 565, 574, which announces the rule that there can be no aiders or abettors in the crime of involuntary manslaughter. Upon the theory of that case, it is contended that, where a person is killed in the commission of an unlawful act, only the one actually perpetrating the act can be guilty. But this contention is not supported by the authorities. Section 9-102 Burns Ann. St. 1933, section 2243 Baldwin's Ind. St. 1934, provides: "Every person who shall aid or abet in the commission of a felony, or who shall counsel, encourage, hire, command or otherwise procure a felony to be committed may be charged by indictment or affidavit, tried and convicted in the same manner as if he were a principal." It is, and always has been, the rule that, where two or more persons conspire and agree to do an unlawful act, which is consummated pursuant to the agreement, each and all are responsible to the same extent as the one actually perpetrating the act. In *Goff* v. *Prime, Sheriff, etc.* (1866), 26 Ind. 196, 197, it is said:

"One aiding and abetting in the commission of a common assault and battery, resulting in the accidental killing of the person assailed, might be guilty of aiding and abetting in the perpetration of the crime of manslaughter." In the Adams case, Adams, Patterson, and another made an unlawful attack upon one White for the purpose of taking a pistol away from him. Patterson got hold of the pistol, which was discharged, apparently accidentally, killing White. It was held that Adams could not have been guilty if the crime amounted to involuntary manslaughter. It is said in the opinion that there was no evidence of an agreement to kill White. But, if there had been, it would have been murder, and not manslaughter. It was also said that, if the taking of the pistol from White was an unlawful act, it was nothing more than a misdemeanor. But this would signify nothing, since, if one is killed as a result of an unlawful assault and battery, it may be manslaughter. It is further said: "An aider and abettor is one who assists another in the accomplishment of a common design or purpose; he must be aware of, and consent to, such design or purpose. But, as we have seen, in involuntary manslaughter, the killing is done without any design or purpose of killing; and if the perpetrator of the crime had no design or purpose of committing it, it is very certain, we think, that there could be no aider or abettor in such crime." But there was the common design or purpose to commit the unlawful assault and battery, and the one who fired the gun had no more purpose and design of killing than the others when they entered together upon the common undertaking, the assault and battery. The purpose of each was the purpose of all, and the act of each, in pursuance of the common design, was the act of all. The one who actually accomplished the killing intended only the assault and battery, and those who assisted in the

assault and battery intended it as much as he. Guilt of involuntary manslaughter is predicated upon the intentional doing of the unlawful act, and not upon intention to kill. The fallacy in the court's reasoning is obvious. The English cases cited as supporting the court's view are readily distinguished. One involves independent trespassers, one of whom had a gun and killed a gamekeeper, out of the presence of, and without any co-operation from, the others. The other was a murder case, in which one of three burglars, who, without the knowledge of the others, carried a gun, shot and killed a person on the premises which were being burglarized. It is true that there can be no accessories in a misdemeanor, but, if a person bears the relationship to a misdemeanor which would constitute him an accessory before the fact if the offense were a felony, he is a principal, and responsible as such. *Stratton* v. *State* (1874), 45 Ind. 468; *Thompson et al.* v. *State* (1920), 189 Ind. 182, 125 N. E. 641. If one procures or encourages another to throw deadly missiles through the windshield of a truck or automobile, he is responsible in the same manner and to the same extent as if he had thrown the missile himself, and, if a person is killed, though there be no intention to kill, he is guilty of involuntary manslaughter if the facts are such that the one who threw the missile is guilty of involuntary manslaughter.

What has been said concerning evidence of other crimes disposes of the objections to other instructions.

There are numerous assignments of error concerning the admission or rejection of evidence. Many of them are based upon the contentions above referred to respecting other crimes. Most of them are concerned with questions seeking to affect the credibility of witnesses, by showing bias, interest, or prejudice. The trial court has a broad discretion in deter-

mining the extent to which an examination for such purposes may be carried. There were questions concerning the support of Haygood's children while he was in jail; others concerned the support of some women witnesses, who were held in confinement pending the trial, and other matters of a similar nature. The condensed recital of the evidence in appellant's brief covers more than 350 printed pages. We do not feel justified in extending this opinion by a detailed consideration of the more than fifty questions and answers discussed. It is sufficient to say that the case was fully and fairly tried; that, where the evidence involved did not concern other offenses, it sought to affect only the credibility of witnesses by disclosing interest, bias, or inducement. Evidence was freely admitted for this purpose, and ample opportunity was given to show the relationship of the witnesses to the transactions and the parties involved. It does not appear that the court abused its discretion in limiting the examination. In many instances the ruling of the court might be sustained for other reasons, but the subject-matter involved is only incidental to the principal issues, and appellant's substantial rights could not have been invaded by the rulings.

Judgment affirmel.